UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY P. POWELL,

                    Plaintiff,

    v.                                     Case No. 22-cv-238-pp

SANDRA SITZMAN, *et al.*,

                    Defendants.

---

**ORDER GRANTING DEFENDANTS' UNOPPOSED MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 82, 90, 94) AND DISMISSING CASE**

---

Plaintiff Timothy P. Powell, who was formerly incarcerated and is representing himself, is proceeding under 42 U.S.C. §1983 on Eighth Amendment claims against various medical officials. The defendants have filed separate motions for summary judgment. Dkt. Nos. 82, 90, 94. The plaintiff has not responded to the motions. The court will grant the unopposed motions and dismiss this case.

**I.     Facts**

    A.     <u>Procedural Background</u>

On February 25, 2022, the court received the plaintiff's complaint, which was assigned to Magistrate Judge Nancy Joseph. Dkt. No. 1. Judge Joseph screened the complaint and allowed the plaintiff to proceed on Eighth Amendment claims of inadequate medical treatment against Sandra Sitzman, Denise Bonnett, Richard G. Heidorn, Michael Rivers, Kelly Darmody and Bruce Russell. Dkt. No. 14.

After counsel had appeared on behalf of defendants Sitzman, Bonnett, Heidorn and Michael Rivers, Judge Joseph issued a scheduling order setting

deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 23. She later stayed those deadlines because two defendants (Russell and Darmody) had not yet answered the complaint. Dkt. No. 32. On September 22, 2022, the case was reassigned to this court for all further proceedings.

Defendants Russell and Darmody subsequently answered. (Dkt. Nos. 40, 43). On November 3, 2022, the court issued an amended scheduling order setting new deadlines for discovery and dispositive motions. Dkt. No. 45. Two and a half months later, however, the plaintiff filed a motion to amend the complaint. Dkt. No. 47. He also filed a motion to extend the deadline for completing discovery, dkt. no. 52, and a discovery motion, dkt. no. 53. Eventually, the court stayed the deadlines it had set in the November 2022 scheduling order pending a ruling on those and other pending motions. Dkt. No. 62. A few weeks later, the court granted in part and denied in part the plaintiff's motion to amend the complaint. Dkt. No. 64. The court observed that the plaintiff wanted to amend only "small details" in his complaint. Id. at 1. The court granted the plaintiff's request to amend only in one small respect; it allowed him to add to the complaint the fact that he was prescribed a "nite" boot as well as a "Crows" boot. Id. at 3.

The court then granted the plaintiff's motion to extend the discovery deadline and ordered the parties to complete discovery by October 6, 2023, and to file dispositive motions by November 10, 2023. Dkt. No. 70. On September 25, 2023, the court received from the plaintiff a notice advising the court that he no longer was incarcerated. Dkt. No. 74. He provided a new address on Melody Lane in Oshkosh, Wisconsin. Id.

On November 8, 2023, the court granted the defendants' motions to extend the dispositive motion deadline to November 17, 2023. Dkt. Nos. 76-80.

At that deadline, the court received motions for summary judgment from defendants Bonnett, Heidorn, Rivers and Sitzman (the State defendants), dkt. no. 82, defendant Darmody, dkt. no. 90, and defendant Russell, dkt. no. 94. On November 20, 2023, the court issued a text-only order requiring defendant Darmody to file a motion that complied with this court's local rules and observing that Darmody had served the defendant at the Department of Corrections, rather than at his post-release address in Oshkosh. Dkt. No. 100. The court ordered defendant Darmody to resend her motion and supporting materials to the plaintiff at his address in Oshkosh. Id. On November 21, 2023—after Darmody had filed a motion that complied with the court's local rules and a certificate of service showing proper service—the court issued an order requiring the plaintiff to respond to all three motions by the end of the day on December 18, 2023. Dkt. No. 103. The court advised,

> If the court has not received the plaintiff's written responses in opposition to the defendants' summary judgment motions by December 18, 2023, the court has the authority to treat the defendants' motions as unopposed, accept all facts the defendants assert as undisputed and decide the motions based only on the arguments in the defendants' briefs, without any input from the plaintiff. That means the court likely will grant the defendants' motions and dismiss the case.

Id. at 2 (emphasis omitted). The court mailed that order to the plaintiff at the Melody Lane address in Oshkosh.

On December 12, 2023, the court granted the plaintiff's first motion to extend his deadline to respond to the motions (Dkt. No. 105) and extended his response deadline to February 2, 2024. Dkt. No. 106. When the plaintiff did not file a response by that deadline, counsel for defendants Darmody and Russell filed letters asking the court to grant their motions and dismiss the case. Dkt. Nos. 107, 108. But on February 12, 2024, the court received the plaintiff's

second motion for an extension of his deadline to respond to the defendants' motions for summary judgment. Dkt. No. 109. The plaintiff explained that he had had mailing issues, and that he had been hospitalized for a "cracked upper rib," which further delayed his response. Id. at 1. The court granted the plaintiff's motion over the defendants' objections and ordered him to file his response by March 20, 2024. Dkt. No. 112. The court advised the plaintiff that because he "had nearly four months to prepare his responses, the court will not further extend this deadline unless the plaintiff shows extraordinary cause for another extension." Id.

The March 20, 2024 deadline passed, and the court did not receive opposition materials from the plaintiff. On March 25, 2024, the court received from the plaintiff a motion asking the court to appoint him counsel. Dkt. No. 113. He explained that after his release from custody, he did not have stable housing and his health was worsening. Id. at 1. He explained the various medical issues he had suffered and problems with his insurance company. Id. at 2. He said he was "about ½ way through" his "answer," and asked for additional time. Id. On April 15, 2024, the court denied that motion and advised the plaintiff that he could take advantage of legal resources available to him as a non-incarcerated person. Dkt. No. 114 at 5–6. The court gave the plaintiff "one, *final* extension of time to file his response materials to the motions for summary judgment," ordering him to "file his opposition materials to the defendants' motions for summary judgment in time for the court to *receive* them by the end of the day on June 14, 2024." Id. at 7. The court again advised the plaintiff that if it did not receive his opposition materials by the end of the day on June 14, 2024, "the court [would] treat the defendants' motions as unopposed and will rule on them." Id. at 7–8.

The June 14, 2024 deadline has passed, and the court has not received the plaintiff's materials or an explanation as to why he was not able to file them by the deadline. The court has not heard from the plaintiff since March 25, 2024, when the court received his motion to appoint him counsel. None of the previous orders sent to the plaintiff at the Melody Lane address he provided in Oshkosh were returned to the court as undeliverable, and the court has no reason to believe he did not receive them at that address. At this point, the plaintiff has had almost eight months in which to prepare and file his opposition materials but has not done so. The court will enforce its previous order and consider the defendants' motions to be unopposed. That means the court will consider the defendants' proposed facts to be undisputed and consider the assertions in the defendants' briefs to be unopposed for purposes of this decision.

B.    Factual Background

1.    *The Complaint*

Although the court is treating the defendants' motions as unopposed, the plaintiff did sign his February 20, 2022 complaint under penalty of perjury. Dkt. No. 1 at 11. It is a verified complaint, which means that it is "not just a pleading; it is also the equivalent of an affidavit for the purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" Beal v. Beller, 847 F.3d 897, 901 (7th Cir. 2017 (quoting Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996)). In deciding the defendants' motions, the court considers the facts from the plaintiff's verified complaint.

The plaintiff alleged that he has a deformed left foot, caused by injections he received before he was incarcerated which damaged the nerves in his left

leg. Dkt. No. 1 at 2. He said that his foot is "turned on its outer side," and his "toes have curled up" and are immobile. Id. This condition makes it difficult for him to walk and causes pain.[1] Id. He alleged that he received an orthotic in 2015, when he was incarcerated at Waupun Correctional Institution. Id. at 3. He said he also saw several specialists while at Oshkosh Correctional Institution and that they prescribed various approaches to treat his foot. Id. He also requested surgery, but Oshkosh staff instead fitted him for a different orthotic that ultimately proved unhelpful and caused blood blisters. Id.

The plaintiff arrived at Winnebago Correctional Center in January 2020. Id. at 3–4. Judge Joseph discussed his treatment at Winnebago:

> [The plaintiff] saw defendant Bruce Russell at Nova Care, and Russell decided to build Powell a "Crows' Boot" to address the problem. However, the "Crow's Boot" did not alleviate his pain, and Russel[l] did not change his course of action. [The plaintiff] also saw five additional specialists between February and June 2021 (all non-defendants), and as a result, the specialists decided that bone fusion surgery would be the best course of action.

> [The plaintiff] asserts that from 2015-2017 when [he] was at Waupun and from 2020-present when [he] was at Winnebago defendant Sandra Sitzman denied his requests for surgery several times, instead directing [the plaintiff] to wear the "Crow's Boot" that Russell created for him. Defendant Denise Bonnett, a nurse practitioner, treated [the plaintiff] from 2015-2017 at Waupun and from 2020-present at Winnebago. Bonnett also denied [the plaintiff's] requests for surgery as recommended by the specialists, instead telling him that he was fine and not experiencing any pain. Defendant Dr. Richard G. Heidorn was [the plaintiff's] doctor both at Waupun and Winnebago, and he refused to consider other treatments after he realized the AFO and the "Crows' Boot" were not addressing [the plaintiff's] condition.

> Defendant Dr. Kelly Darmody also treated [the plaintiff] at Winnebago, and had [him] remain in the "Crows' Boot" even though

---

[1] The plaintiff submitted a video showing his disformed foot and ability to walk with some difficulty. Dkt. No. 73. The video is not dated, and it is not clear when it was filmed.

she knew it was not addressing [his] condition. She also did not prescribe him pain medication.

Dkt. No. 14 at 4–5 (internal citations omitted). In his request to amend the complaint, the plaintiff stated that "not only [was he] required to wear the 'Crows' boot in a four story building he was required to wear a 'nite' boot also the whole time having a fractured (split) bone in the deformed foot." Dkt. No. 47 at 1.

Judge Joseph did not allow the plaintiff to proceed on claims relating to his treatment while he was incarcerated at Waupun and Oshkosh. Id at 7. She allowed him to proceed on Eighth Amendment claims only against the persons who treated him while he was incarcerated at Winnebago. Id. at 8.

### 2. *The Defendants' Undisputed Facts*

As the court has explained, the State defendants, defendant Darmody and defendant Russell each filed their own motion for summary judgment, brief in support and proposed facts. Dkt. Nos. 82–84 (State defendants), 90, 101–02 (Darmody), 94–96 (Russell). The court will separately address each motion.

### a. State Defendants

Sitzman was the Nursing Supervisor/Health Services Manager at Winnebago until her retirement on February 3, 2022. Dkt. No. 84 at ¶2. Bonnett was and is an Advanced Practice Nurse Prescriber (APNP). Id. at ¶4. Heidorn is a physician who retired from state service on June 29, 2021. Id. at ¶5. Rivers was employed as the Correctional Services Manager of the Wisconsin Bureau of Health Services. Id. at ¶6.

### i. **The Plaintiff's Medical History**

The defendants provide significant background regarding the plaintiff's medical issues. Id. at ¶¶13–32. Relevant to his claims in this lawsuit, in June 2016, an outside specialist diagnosed the plaintiff with peroneal muscle atrophy,

cavus foot and pain in his left foot. Id. at ¶17. The specialist wrote the plaintiff a prescription for a rigid Ankle Foot Orthotic (AFO) to maintain stability of his ankle and foot and to attempt to hold it in the proper position. Id. at ¶18. Other offsite specialists fitted him for the AFO in September 2016. Id. at ¶20. In November 2017, an orthopedist reviewed scans of the plaintiff's foot and recommended a neurology consultation because he did not believe an orthopedic intervention was available to treat the plaintiff's condition. Id. at ¶23.

In December 2017, offsite specialists at Sisson Mobility casted the plaintiff for a Charcot Restraint Orthotic Walker (CROW) boot, which is a weight relieving AFO aimed at controlling the foot and ankle and offloading pressure. Id. at ¶¶24–25. The plaintiff did not receive this device before he was released from prison the same month. Id. at ¶26. He was reincarcerated in May 2019, and Sisson Mobility remeasured and recast him for another AFO with a padded foot section. Id. at ¶29. The plaintiff received the new AFO in August 2019 and reported being satisfied with the fit and function. Id. at ¶30. The plaintiff had a follow-up in October 2019 for adjustments to the AFO, which he received in January 2020; he reported that the new device "felt better." Id. at ¶¶31–32.

ii. **The Plaintiff's Treatment at Winnebago**

The plaintiff arrived at Winnebago in January 2020 and underwent a medical screening. Id. at ¶33. His restriction for a low tier/low bunk was not reinstated at that time. Id. The plaintiff began complaining about his AFO, saying that he "[didn't] need it" and could walk up to three miles per day without it. Id. at ¶34; Dkt. No. 89-1 at 60. Medical staff encouraged him to wear his orthotic to determine if it was effective for his condition. Dkt. No. 84 at ¶34. On February 19, 2020, the plaintiff met with Dr. Heidorn about his medical restrictions. Id. at ¶36. Dr. Heidorn noted that the plaintiff could walk

"without any difficulty" and was not wearing his AFO. Dkt. No. 89-1 at 80. The plaintiff was wearing "soft leather shoes" that provided no orthopedic benefit. Dkt. No. 84 at ¶37. Dr. Heidorn requested an EMG on the plaintiff's leg to determine the cause of his condition and ordered physical therapy to determine his need for a medical restriction. Id. at ¶38. The plaintiff underwent the EMG in March 2020, which suggested a pinched nerve. Id. at ¶39.

The plaintiff saw a physical therapist on March 24, 2020, who noted that the plaintiff was not wearing his AFO and was wearing only institution-issued black Velcro shoes. Id. at ¶¶40–41. The physical therapist provided the plaintiff a Velcro ankle brace for support. Id. at ¶42. Dr. Heidorn saw the plaintiff on June 1, 2020, for a follow-up from his EMG and physical therapy and noted that he was not wearing the AFO or ankle brace and instead wore "Velcro soft shoes which are badly worn." Id. at ¶43; Dkt. No. 89-1 at 77. Heidorn referred the plaintiff to nursing and to a provider for new shoes. Dkt. No. 89-1 at 78.

On June 9, 2020, the plaintiff had his only visit with Sitzman about his request for replacement shoes. Dkt. No. 84 at ¶44. She recommended that he use an orthotic, but the plaintiff said he "prefer[red] to stay with the current shoe," which he said "work[ed] for [him]." Dkt. No. 89-1 at 58–59. Sitzman requested a replacement pair of Velcro shoes. Id. at 59. The plaintiff also asked for a change in his medical classification from "moderate" to "any" activity, so that he could work a community job. Id. Sitzman noted that she did not have the authority to change his classification, but that he could discuss it with his provider at his next medical appointment. Id. The plaintiff received his new Velcro shoes six days later, which he said "fit well." Id. at 58. On June 29, 2020, Dr. Heidorn changed the plaintiff's medical classification from

"moderate" to "any" activity after observing his condition during their appointments. Dkt. No. 84 at ¶50.

The plaintiff refused an offsite appointment in July 2020, to avoid COVID-19 quarantine after his return. Id. at ¶51. He continued to forego wearing his AFO, and Dr. Heidorn ordered consultations for his foot once the pandemic restrictions were lifted. Id. at ¶52. On December 30, 2020, Bonnett first saw the plaintiff for a generic consultation. Id. at ¶53. The plaintiff reported using an elliptical twenty minutes a day for exercise and continuing to forego wearing his AFO; the plaintiff asked for a consultation for a brace with "the place in Fond du lac" because it "was 'perfect.'" Dkt. No. 89-1 at 74.

In January 2021, the Health Services Unit at Winnebago placed an order for the plaintiff to be fitted for a new AFO with a podiatrist. Dkt. No. 84 at ¶56. On January 22, 2021, he had an offsite visit at NovaCare Prosthetics and Orthotics, where defendant Russell recommended a rigid AFO with an accompanying shoe. Id. at ¶58; Dkt. No. 89-1 at 141. The plaintiff saw another specialist on February 3, 2021 for an EMG and MRI to assess nerve damage and evaluate his left foot. Dkt. No. 84 at ¶59. The specialist reviewed the results and concluded that any surgical intervention on the plaintiff's lumbar spine to address his left foot "will be of minimal benefit." Id. at ¶¶60–61. He recommended considering "other potential treatment option[s]" including a tendon transfer "to improve his foot posture for ambulation." Id. at ¶61.

In February 2021, the plaintiff saw his physical therapist, who noted that the plaintiff was not wearing his custom AFO or ankle brace. Id. at ¶62. He gave the plaintiff a night brace to wear to stretch his foot, but the plaintiff also refused to wear that. Id. at ¶¶62–63. The physical therapist issued the plaintiff a short cam boot, which is a smaller orthotic that provides support and

stability. Id. at ¶65. The same month, medical staff provided the plaintiff another pair of black Velcro shoes. Id. at ¶64. He reported being "very content to have a sturdy pair [of shoes] that he [could] walk outside in without pain." Id.; Dkt. No. 89-1 at 57.

On March 2, 2021, the plaintiff saw Bonnett for a follow-up appointment. Dkt. No. 84 at ¶66. He requested a second opinion on his need for surgery and was awaiting the new custom brace. Dkt. No. 89-1 at 72. Later that month, the plaintiff saw another offsite specialist for a second opinion on his need for spinal surgery. Dkt. No. 84 at ¶67. The specialist recommended that the plaintiff visit a podiatrist or foot and ankle specialist for a treatment plan. Id. at ¶68. He did not think spinal surgery was appropriate to heal the plaintiff's nerves or treat his left foot or leg issues and opined that it would provide "no chance of strength recovery." Id.

On April 29, 2021, the plaintiff returned to NovaCare and saw Russell for a fitting of his new custom AFO and shoe. Id. at ¶69. In May 2021, he saw yet another specialist, a doctor of podiatric medicine, for evaluation of his ankle and foot issues. Id. at ¶70. This doctor recommended fusion surgery on the plaintiff's ankle, subtalar joint and midfoot as "the best solution." Id. at ¶71. He recommended a referral to the University of Wisconsin-Madison Health Orthopedics for surgery. Id. The plaintiff received his new AFO in May 2021, and Russell also fitted him for a CROW boot. Id. at ¶72. Russell noted that the plaintiff walked in the CROW boot and "was comfortable" in it. Id. at ¶73.

On June 10, 2021, the plaintiff had an appointment with a registered nurse. Id. at ¶74. She reported that the plaintiff was wearing only black Velcro shoes and was not wearing his AFO or CROW boot. Id. The plaintiff told the nurse that he wore it for about two weeks, but that it hurt his back. Dkt. No.

89-1 at 56. He said he wore it at night and "[would] just wait till [he] [saw] that specialist." Id. The nurse advised the plaintiff not to wear his brace at night and told him that it was meant to be worn while walking. Id.

On June 14, 2021, an orthopedic specialist at the University of Wisconsin saw the plaintiff to discuss surgery. Dkt. No. 84 at ¶75. The specialist reviewed alternative treatment plans but ultimately recommended surgery, after the plaintiff reported exhausting conservative treatment options. Id. at ¶¶76–77. Wisconsin Department of Corrections (DOC) Medical Director Dr. Daniel LaVoie (not a defendant) avers that the plaintiff's recommended surgery was classified as "Class III," which means the plaintiff had a non-urgent condition that "would not present a significant threat to the patient's general medical health and would not be likely to pose such a threat in the foreseeable future." Dkt. No. 85 at ¶¶99–100. A committee made up of Dr. LaVoie and other medical staff would determine whether to authorize surgery. Id. at ¶¶100–101. On June 23, 2021, Bonnett reviewed the University of Wisconsin specialist's recommendation and sent an email to Sitzman and Drs. LaVoie and Darmody detailing the plaintiff's medical history from June 2016 to June 2021 and the institution's care of his left foot. Dkt. No. 84 at ¶¶83–84; Dkt. No. 86 at ¶53; Dkt. No. 89-1 at 49–50.

Dr. LaVoie reviewed the plaintiff's medical chart and medical history and denied the request for surgery because the plaintiff "had not sufficiently exhausted all conservative treatment methods at that time that the Class III Committee would be evaluating this request for surgery." Dkt. No. 85 at ¶¶106–107. He noted the plaintiff's offsite visits, the imaging tests and other studies that the plaintiff had undergone, the custom AFOs and other orthotics he had received but complained about and the adjustments made because of his

complaints. Id. at ¶¶109–110, 112. He considered the plaintiff's refusal to comply with his orthopedist's recommendations and to wear his orthotics, his requests for surgery, his request to lift his medical restriction so he could work two active jobs and his ability to walk and exercise without the AFO and with only the black Velcro shoes. Id. at ¶¶111, 113–116. He also noted that the plaintiff had refused offsite appointments, and that most offsite specialists did not recommend surgery. Id. at ¶¶117–118. Dr. LaVoie also considered that surgery would be very painful, was "not at all likely to fully correct the abnormality" and would require an extended healing period. Id. at ¶¶120–121. He concluded that the plaintiff was "a poor surgical candidate" who "preferred a quick fix with surgical intervention." Id. at ¶122. He opined that the plaintiff's current treatment plan "could not be properly evaluated for effectiveness" and that non-surgical options were "a reasonable alternative." Id. at ¶¶119, 123.

Dr. LaVoie emailed his conclusion to Bonnett, explaining that the plaintiff "has not failed conservative therapy; he hasn't done it long enough." Dkt. No. 89-1 at 48. Bonnett responded that she would tell the plaintiff that he "needs to do the AFO and send back to Novacare in 6 months for recheck." Id. Bonnett did not present a recommendation for or against surgery to Dr. LaVoie, Bonnett had no role in the decision to deny surgery and she had no authority to override Dr. LaVoie's decision. Dkt. No. 84 at ¶¶93–94. She told the plaintiff to continue wearing the custom AFO, and informed him that he would have a follow-up appointment in six months. Id. at ¶97. She did not have any more interactions with the plaintiff while he was housed at Winnebago. Id. at ¶98.

Sitzman avers that she was not involved in the decision to deny surgery, and she did not have the ability to override the recommendation or authorize

surgery for any patient. Dkt. No. 87 at ¶¶64–65. She avers that she had no reason to dispute or doubt Dr. LaVoie's decision. Id. at ¶65.

On July 12, 2021, Dr. Darmody referred the plaintiff for an offsite appointment with NovaCare to discuss his AFO. Dkt. No. 84 at ¶99. In August 2021, the plaintiff told Dr. Darmody that the AFO was causing him discomfort, and she allowed him to remove it before his upcoming appointment with NovaCare. Id. at ¶100. He had that follow-up a few days later, and Russell reported a thirty-five percent improvement in the plaintiff's condition. Id. at ¶101. The same day, Dr. Darmody emailed Dr. LaVoie another request for a Class III Evaluation of the plaintiff's condition and recommendation for surgery. Id. at ¶102. She noted that the recommended surgery was "very extensive," and that the plaintiff had been consistently wearing his AFO since the previous Class III denial. Id. at ¶103. Dr. LaVoie maintained that surgery was not appropriate because the plaintiff had just begun complying with the conservative treatment options afforded him, and he had seen improvement in his condition as NovaCare had reported. Id. at ¶¶105–106. Dr. LaVoie says this improvement was "an extraordinarily favorable result." Dkt. No. 85 at ¶136. He concluded that when the plaintiff wore the AFO as prescribed, it improved his condition. Id. at ¶137. He recommended that the plaintiff continue wearing the AFO and undergoing physical therapy. Id. at ¶138.

The plaintiff had three physical therapy appointments in September 2021. Dkt. No. 84 at ¶112. Each time, the therapist noted that the plaintiff was complying with the AFO and wearing the device. Id. A few months later, in December 2021, APNP Lemmenes (not a defendant) ordered that the plaintiff be sent back to the University of Wisconsin to confirm if he remained a candidate for surgery. Id. at ¶113. The plaintiff had that appointment on February 28,

2022, and a specialist again recommended surgery. Id. at ¶114. On March 2, 2022, Lemmenes submitted a Class III Evaluation based on the recommendation for surgery. Id. at ¶115. This time, Dr. Francesca DeTrana was the head of the committee that reviewed the request, and she approved it. Id. at ¶115. In August 2022, the plaintiff received a two-part surgery on his left foot. Id. at ¶116. None of the defendants were involved in that committee or its decision to approve surgery for the plaintiff. Id. at ¶117.

### iii. **Defendant Rivers**

As the Correctional Services Manager of the Wisconsin Bureau of Health Services, Rivers avers that he is not a licensed physician or medical provider, never served as Medical Director, never reviewed the plaintiff's medical records and was not involved in any treatment or treatment plan for the plaintiff or his foot. Dkt. No. 88 at ¶¶8–11. Rivers avers that he never personally examined the plaintiff, reviewed his requests for outside treatment or approved or denied his requests for surgery—which are beyond the scope of his professional knowledge and role. Id. at ¶¶12–14.

### b. Defendant Darmody

Dr. Darmody is an internist and primary care physician who was employed by Consilium Staffing, LLC at the time of the events the plaintiff described in the complaint. Dkt. No. 101 at ¶3. Consilium contracted with Winnebago to provide medical care to incarcerated persons, and Dr. Darmody served as a primary care physician from May to August 2021 in place of a physician who had taken leave. Id. at ¶¶4–6.

Dr. Darmody first treated the plaintiff in June 2021. Id. at ¶7. She reviewed his records and medical history, including his left foot deformity and use of orthotics to help control instability and pain. Id. at ¶¶7–8. Dr. Darmody

learned that the plaintiff recently had been to NovaCare in January and April 2021, where defendant Russell recommended that the plaintiff wear the CROW boot. Id. at ¶9. She also learned that the plaintiff had seen specialists at the University of Wisconsin about surgery, and he told her he wanted surgery. Id. at ¶¶10–11. She avers that she is aware that incarcerated persons must seek approval from a medical review board for elective procedures. Id. She reviewed the plaintiff's chart, summarized in writing the plaintiff's case for surgery and sent that information to the medical review board on his behalf on June 23, 2021. Id. The review board ultimately denied the plaintiff's request for surgery and elected to continue conservative measures to treat his foot. Id. at ¶13. Dr. Darmody advised the plaintiff to follow the board's recommendation to wear the CROW boot as prescribed, and said that they could revisit surgery as an option in the future. Id. at ¶16.

Dr. Darmody saw the plaintiff again on July 12, 2021. Id. at ¶17. She reported that he had been wearing the CROW boot since the board denied his request for surgery, but he felt it was "making his stiffness and pain worse." Id. He requested a follow-up visit with NovaCare. Id. The follow-up was scheduled for August 16, 2021. Id. at ¶18. On August 11, 2021 (prior to the scheduled follow-up visit with NovaCare), Dr. Darmody saw the plaintiff for his complaints of knee and hip pain while wearing the CROW boot. Id. at ¶19. She advised him to stop wearing the boot temporarily until his appointment with NovaCare five days later. Id.

Dr. Darmody saw the plaintiff again on August 18, 2021, after his follow-up with NovaCare. Id. at ¶22. He agreed to follow through on his plan of care, but after he complained about gaining weight, Dr. Darmody advised him that he could take off the CROW boot to use the elliptical for exercise. Id. She also

put in an order for physical therapy to help manage the plaintiff's pain. Id.
Dr. Darmody started the plaintiff on acetaminophen for his pain, beginning in
July 2021. Id. at ¶23.

Dr. Darmody's temporary work at Winnebago ended in August 2021, and
she did not again see or treat the plaintiff. Id. at ¶24. She avers that all
treatment decisions and recommendations were hers alone and were not
influenced by any outside source. Id. at ¶26. She believes her treatment met
the standard of care, and she exercised her professional judgment when
treating the plaintiff and making medical recommendations. Id. at ¶¶26–27.

c. Defendant Russell

Russell is a certified orthotist, and he worked at Actra Rehabilitation
d/b/a NovaCare Orthotics and Prosthetics during the events described in the
complaint. Dkt. No. 95 at ¶13. He has been a practicing orthotist since 1985. Id.
at ¶14. An orthotist makes and fits supportive braces and splints for individuals
with weakened limbs or other body parts. Id. at ¶16. Russell is not a medical
doctor and does not provide medical diagnoses or opinions. Id. at ¶17. He
typically receives an order from a physician to build and provide an orthotic. Id.
at ¶¶18–19. Russell avers that he is not and never has been an employee of the
DOC, nor has he contracted with the DOC to provide services. Id. at ¶¶20–21.
He saw the plaintiff only at NovaCare and did not provide him care at any
correctional institution. Id. at ¶25. He notes that the DOC would need to order
and approve any orthotic he recommended for a person incarcerated there. Dkt.
No. 98 at ¶4.

In July 2016, while he was incarcerated (but not at Winnebago), the
plaintiff asked to try an AFO, and a podiatrist referred him to NovaCare. Dkt.
No. 95 at ¶¶26–29. Russell first saw the plaintiff on July 19, 2016. Id. at ¶30.

He noted that the plaintiff's left toes were "claw toes," and his foot was turned inward. Id. at ¶33. Russell recommended a custom hinged AFO that the plaintiff could wear inside a shoe to help with pain and instability. Id. at ¶34. Russell saw the plaintiff again in July 2017 for a follow-up of his AFO. Id. at ¶36. He did not see the plaintiff again until January 2021. Id. at ¶37. Russell notes that the plaintiff instead saw David Sisson (not a defendant) at Sisson Mobility between July 2017 and January 2021. Id. at ¶38.

On December 30, 2020, the plaintiff asked Bonnett "to go back to the place in Fond du Lac for a new brace." Id. at ¶41. On January 22, 2021, the plaintiff had an offsite appointment with Russell at NovaCare in Fond du Lac to be evaluated for a new AFO. Id. at ¶46. He told Russell that his previous AFO "worked great," but that he had lost it and had received a new one from a different provider. Id. at ¶47. Russell assessed the plaintiff's AFO and determined that it did not fit and could not be repaired. Id. at ¶48. He also determined that the plaintiff's foot condition had "significantly changed and worsened" since 2017, and that it would be difficult for him to fit the plaintiff with an adequate all-day brace. Id. at ¶50. Russell recommended a CROW boot for the plaintiff's left foot, rather than an AFO worn inside a shoe, and an orthopedic shoe on his right foot to compensate for the additional height that the CROW boot would add to his left side. Id. at ¶51. Russell's plan was to "loosen up" the plaintiff's left ankle with use of the CROW boot so he could then switch to an AFO that would fit into a shoe. Dkt. No. 98 at ¶14. He avers that if the CROW boot "did not work to loosen up the ankle," he might suggest surgery. Id. Medical officials at Winnebago approved the CROW boot and other devices in February 2021. Id. at ¶16.

On April 29, 2021, Russell saw the plaintiff again at NovaCare in Fond du Lac to fit him for his CROW boot and right orthopedic shoe. Dkt. No. 95 at ¶64. Russell noted that the boot fit well, and he added a lift to the right shoe to balance the plaintiff's pelvis from wearing the boot. Id. He instructed the plaintiff to return in a week or two for the final fitting. Id. The plaintiff returned on May 14, 2021 and received his CROW boot and orthotic shoe. Id. at ¶65. Russell noted that the plaintiff appeared comfortable walking in the boot. Id. at ¶66. He advised the plaintiff to return in six months—sooner if he had any issues with the devices. Id. at ¶¶67–68.

On August 16, 2021, after the Class III Committee denied the plaintiff's request for surgery, the plaintiff returned to NovaCare to see Russell for complaints that the CROW boot was causing him hip and knee pain. Id. at ¶84. Russell notes that he had learned before this visit that the plaintiff had not worn the CROW boot as frequently as Russell had advised. Dkt. No. 98 at ¶19. He explains that hip and knee pain are common from patients newly using an AFO and can occur "because the brace is now loosening up the foot, because a patient is now walking more and in a corrected posture, and because of the weight of the brace." Id. He avers that the pain often "subsides in time as the patient becomes acclimated to wearing the AFO." Id.

Russell assessed the plaintiff and determined that the CROW boot had helped the plaintiff's left ankle and foot improve by thirty-five percent. Id. at ¶20. He calls this "a substantial improvement" that indicated to Russell "that the CROW boot was working as intended." Id. Russell also assessed the plaintiff in the CROW boot and "noted that the brace was controlling his foot as it was designed to do." Id. at ¶21. Russell had "no concerns regarding the fit or function of" the boot, and he "noted no redness or irritation" to the plaintiff's

skin under the boot. Id. Russell avers that this confirmed that the boot fit the plaintiff's left foot and leg properly. Id.

The plaintiff told Russell during the August 16, 2021 appointment that he was going to have surgery on his foot and ankle soon, though he had not yet been approved for surgery at that time. Dkt. No. 95 at ¶92. Russell nevertheless advised the plaintiff to follow his doctor's orders and to continue wearing the CROW boot until he had surgery because of the substantial improvement it had provided him. Id. at ¶93. He determined that there were no necessary adjustments to the AFOs because they were working as intended. Dkt. No. 98 at ¶22. Russell told the plaintiff that he could follow-up after surgery to review the AFO and be fitted for a new one, if necessary. Id. He did not provide an opinion on the plaintiff's need for surgery or pain medication. Id. at ¶23. Russell has not seen the plaintiff since August 16, 2021, nor has he been consulted on his care or treatment. Id. at ¶25.

Russell avers that he exercised his professional judgment as an orthotist when treating the plaintiff. Id. at ¶26. He notes that the plaintiff never complained that he wanted a different type of AFO, and he avers that no other type of AFO would have been effective to treat the plaintiff's left foot deformity. Id. Russell maintains that his treatment and the use of the CROW boot helped the plaintiff's left foot and ankle and did not cause him any injury. Id. at ¶28.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the

outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B.    Eighth Amendment

The Eighth Amendment governs the plaintiff's claim that the defendants were deliberately indifferent to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once.'" Karraker v. Peters, 65 F.3d 170 at *3 (7th Cir. 1995) (citing Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991)).

To satisfy the subjective component, the plaintiff must demonstrate that the defendants had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendants' "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844–45).

For a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

C.    Analysis

In the screening order, Judge Joseph determined that the plaintiff's allegations about his deformed left foot satisfied the objective component of an Eighth Amendment claim. Dkt. No. 14 at 6. None of the defendants contest that conclusion. The remaining question is whether the evidence shows that the defendants were aware of but were deliberately indifferent to the plaintiff's serious medical need.

1.    *State Defendants*

The undisputed evidence would not allow a reasonable jury to conclude that the State defendants were deliberately indifferent to the plaintiff's medical need. That evidence (including the plaintiff's own allegations in his verified complaint) shows that while the plaintiff was incarcerated at Winnebago, he received extensive treatment including imaging tests to uncover the cause of his deformity, offsite visits at NovaCare (per his request) to fit and adjust his custom orthotic, physical therapy to address his pain and offsite visits with various orthopedists and other specialists. Medical staff saw him frequently to provide him pain medication and other conservative treatment in line with his treatment plan and use of the AFO. Medical staff often noted that the plaintiff was not following his treatment plan and was not wearing his AFO as prescribed, was exercising regularly, was working two jobs at the institution and was walking up to three miles daily without using his AFO.

a.    Defendant Sitzman

The evidence shows that Sitzman had a limited role in the plaintiff's care at Winnebago. She personally saw the plaintiff only once—on June 9, 2020— and he told her during that appointment that he preferred wearing standard-issued black Velcro shoes that the institution had provided him. Sitzman

23

ordered the plaintiff a new pair of those shoes because the ones he had were worn. The plaintiff asked Sitzman to lift a medical restriction and allow him to work a physical job, but she explained that he would have to ask his provider to make that change. He obtained new shoes shortly after this appointment and followed Sitzman's instructions to talk with his provider about the medical restriction. This evidence would not allow a reasonable jury to find that Sitzman was deliberately indifferent to the plaintiff's medical needs, and she had no other personal interactions with him.

The plaintiff alleges in his complaint that Sitzman, as the Health Services Unit Manager, "is in charge of all nurses and employees in the H.S.U[.] [and] nothing goes on with out [*sic*] her knowledge or approval." Dkt. No. 1 at 6. That implies that the plaintiff believes Sitzman is liable because she held this managerial role. But "[s]upervisors are responsible for what they do themselves, not for what their subordinates do." Day v. Subsecretario del Sistema Penitenciario Federal, 838 F. App'x 192, 193 (7th Cir. 2021). For Sitzman to be subject to liability under §1983, the plaintiff must present evidence showing that Sitzman knew about her subordinates' misconduct and facilitated, approved or condoned it or "turn[ed] a blind eye for fear of what [she] might see." Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001). There is no evidence suggesting that Sitzman was aware of any subordinate providing the plaintiff unconstitutionally deficient care and ignored or condoned that misconduct. There is no evidence suggesting that *any* medical official provided the plaintiff unconstitutionally deficient care at all.

The plaintiff also alleges in the complaint that Sitzman repeatedly denied his requests for surgery. But the undisputed evidence shows that Sitzman was not responsible for deciding whether the plaintiff would receive surgery. That

decision came from the Class III Committee, and there is no evidence that Sitzman was a part of the committee that denied the plaintiff's first request for surgery or the committee that later approved the surgery. Nor is there evidence that she gave the committee information that led to it deny the plaintiff's request for surgery. There is no evidentiary basis from which a reasonable jury could find that Sitzman was aware of but deliberately indifferent to the plaintiff's need for surgery to correct his deformed foot. She is entitled to judgment as a matter of law.

b.    Defendant Bonnett

The plaintiff alleges that Bonnett denied his requests for surgery and provided him unconstitutional care. The undisputed evidence does not support that finding. The evidence shows that Bonnett first saw the plaintiff in December 2020, at which time she ordered an offsite referral with NovaCare because the plaintiff told her it had provided him a "perfect" AFO in the past. He saw Bonnett again in March 2021, and she ordered a second opinion on his need for spinal surgery after a specialist concluded that the risk of surgery did not outweigh any potential benefit. After the specialists at the University of Wisconsin recommended that the plaintiff undergo fusion surgery on his foot and ankle, Bonnett provided detailed, relevant information to Dr. LaVoie for the Class III Committee to review. Dr. LaVoie, who is not a defendant, performed his own review of the plaintiff's medical history and ultimately denied the plaintiff's request for the surgery. Bonnett avers that she had no role in that determination and had no authority to overrule or overturn it. There is no evidence suggesting otherwise.

No reasonable jury could conclude that Bonnett's limited involvement in the plaintiff's medical care shows deliberate indifference. Instead, the evidence

shows that she *approved* his various requests for treatment or second opinions about his need for surgery. Bonnett approved the plaintiff's request to return to NovaCare, where he had received beneficial orthotics; ordered a second opinion on his need for spinal surgery, as he requested; and provided detailed information to the Committee about his need and request for surgery. The plaintiff cannot hold Bonnett responsible for Dr. LaVoie's decision to deny him surgery in June 2021 because there is no evidence that Bonnett had any involvement in that decision or any authority to override it. See Ducksworth v. Maassen, Case No. 23-3431, 2024 WL 2265025, at *2 (7th Cir. May 20, 2024) (citing Miller v. Harbaugh, 698 F.3d 956, 962 (7th Cir. 2012)) (holding that prison official "cannot be held liable for failing to take steps beyond her power").

Even if Dr. LaVoie were a defendant, the undisputed evidence shows that he reviewed the plaintiff's medical history and exercised his medical judgment in determining whether surgery was appropriate for the plaintiff. He listed numerous considerations underlying his decision to deny surgery, including that the plaintiff repeatedly failed to comply with conservative treatment that may have adequately addressed the plaintiff's medical issues without the need for surgery. There is no evidence that Dr. LaVoie's decision contradicts accepted professional standards. His reasoned medical determination is not deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

c.    Defendant Heidorn

The undisputed evidence would not allow a reasonable jury to find that Dr. Heidorn was deliberately indifferent to the plaintiff's medical needs. Dr. Heidorn first saw the plaintiff on February 19, 2020. He noted that the plaintiff was able to walk without difficulty and without wearing his AFO. Dr. Heidorn requested an EMG to better understand the plaintiff's condition and scheduled him for physical therapy. The plaintiff attended those appointments but did not wear his AFO. Dr. Heidorn saw the plaintiff in June 2020 for a follow-up and again noted that he was not wearing the AFO; instead the plaintiff was wearing standard-issue black Velcro shoes. Heidorn referred the plaintiff to a provider, who ordered new Velcro shoes for the plaintiff as he had requested. Later that month, Dr. Heidorn approved the plaintiff's request to change his medical classification to allow all activity, after determining that the plaintiff was able to work a community job. The plaintiff later refused to attend an offsite neurology appointment that Dr. Heidorn had scheduled because the plaintiff did not want to wait in COVID-19 quarantine after returning to Winnebago. In August 2020, Dr. Heidorn again saw the plaintiff, placed another order for an EMG and told the plaintiff he was on the list for these appointments once COVID restrictions were lifted. Dr. Heidorn had no further contact with the plaintiff, and he was not involved with the committee's decisions on the plaintiff's requests for surgery.

Nothing about this evidence would allow a reasonable jury to conclude that Dr. Heidorn's treatment decisions were "so inadequate that [they] demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763. The evidence shows that Dr. Heidorn ordered offsite tests and conservative treatment measures (including physical therapy) to treat the plaintiff and his

27

symptoms as they presented in 2020. Dr. Heidorn referred the plaintiff for new Velcro shoes when he refused to wear his AFO and his shoes had worn out. He allowed the plaintiff to return to all activity when the plaintiff insisted that he could work a community job. Dr. Heidorn responded to the plaintiff's requests based on how he presented at appointments. He cannot be held responsible for complications the plaintiff encountered from failing to follow his treatment plan. There also is no evidence that Dr. Heidorn "refused to consider other treatments" when the CROW boot seemed ineffective, as the plaintiff alleges in his complaint. There isn't even evidence that Dr. Heidorn *saw* the plaintiff after he received the CROW boot in 2021. The evidence shows that Dr. Heidorn last treated the plaintiff in August 2020 and was not involved in his treatment in 2021. A reasonable jury could not find Dr. Heidorn liable for not addressing the plaintiff's complaints that were never presented to him. He is entitled to judgment as a matter of law.

> d.    Defendant Rivers

Finally, no reasonable jury could find that defendant Rivers was deliberately indifferent to the plaintiff's medical needs because there is no evidence that he was ever involved in the plaintiff's care. The undisputed evidence shows that Rivers is not a medical provider, did not review the plaintiff's medical records and was not involved in any treatment or treatment plan for the plaintiff or his foot. The defendants aver that the plaintiff may have mistakenly believed that Rivers is the DOC Medical Director, but the evidence shows that Dr. LaVoie holds that role. Because there is no evidence that Rivers had *any* personal involvement in the plaintiff's care or treatment, he cannot be held liable under §1983. See, *e.g.*, Stankowski v. Carr, Case No. 23-2458, 2024 WL 548035, at *2 (7th Cir. Feb. 12, 2024) (citing Taylor v. Ways, 999 F.3d 478,

493 (7th Cir. 2021)) ("To be liable under § 1983, a defendant must be personally responsible for the violation of a constitutional right.").[2]

### 2. *Defendant Darmody*

The undisputed evidence would not allow a reasonable jury to find that Dr. Darmody was deliberately indifferent to the plaintiff's medical needs. The evidence shows that Dr. Darmody treated the plaintiff briefly—from June to August 2021. During that time, she saw the plaintiff three times. After the first appointment in June 2021, she pursued the plaintiff's request for the surgery recommended by an offsite specialist and presented the plaintiff's case to the review board. She was not a member of that board and did not have any say in the final decision. When the review board denied the request, she advised the plaintiff to wear his CROW boot to comply with the board's conclusion that conservative measures would adequately treat his foot. She told him that if issues persisted, he could ask again about surgery in the future.

After the second appointment in July 2021, Dr. Darmody scheduled a follow-up appointment with NovaCare to address the plaintiff's concerns that his CROW boot was causing pain. When he reported being in continuous pain days before his scheduled follow-up, she advised him that he could remove the boot until his appointment to address his concerns. When she saw the plaintiff the final time in August 2021, she reviewed Russell's findings that wearing the CROW boot had significantly helped the plaintiff's foot and advised the plaintiff

---

[2] The State defendants argue that if the court declines to grant summary judgment in their favor, they are entitled to qualified immunity. Dkt. No. 83 at 26–27. But "[w]here a defendant 'wins on the facts, [he] does not need qualified immunity.'" Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

to continue this plan of care, as Medical Director LaVoie had recommended in lieu of surgery. She referred the plaintiff for physical therapy and provided pain medication for his lingering pain. After this appointment, Dr. Darmody emailed Dr. LaVoie and requested another Class III evaluation of the plaintiff's condition and recommendation for surgery. Dr. LaVoie ultimately denied the request, maintaining his position that surgery was not appropriate.

Nothing in the undisputed evidence suggests that Dr. Darmody's brief involvement in the plaintiff's care was incompetent or not based on her exercise of medical judgment. Quite the opposite, the undisputed evidence shows that Dr. Darmody provided the plaintiff care based on his medical history and his complaints and offered treatment in accordance with what she believed to be the best course of action. By definition, that is not deliberate indifference. See Zaya, 836 F.3d at 805.

The plaintiff alleges in the complaint that Dr. Darmody told him to remain in the CROW boot even though he told her that it was not improving his condition. This allegation lacks context. Dr. LaVoie denied the plaintiff's first request for surgery in part because the plaintiff had not been following his plan of care and wearing his AFO. Dr. Darmody advised the plaintiff to strictly comply with his plan of care so that the review board might grant a future request for surgery if conservative measures continued to prove unhelpful despite full compliance. The plaintiff did complain that his AFO did not fit properly, so Dr. Darmody arranged for a follow-up with NovaCare to ensure that he could follow Dr. LaVoie's recommendation. Contrary to the plaintiff's allegations, the evidence shows that Dr. Darmody also provided additional interventions to address his pain, including acetaminophen, physical therapy and a brief respite from wearing the CROW boot days before his follow-up with NovaCare. She then

sent Dr. LaVoie a second request for Class III evaluation of the plaintiff's eligibility for surgery—only two months after LaVoie had denied the first request—because the plaintiff had been complying with his plan of care and remained in pain. Dr. LaVoie denied this request; but as with Bonnett, Dr. Darmody cannot be held responsible for that decision. See Ducksworth, 2024 WL 2265025, at *2. Although Dr. Darmody left Winnebago in August 2021, the plaintiff eventually received surgery when conservative treatments continued to prove ineffective even with full compliance—just as Dr. Darmody had suggested.

The undisputed evidence would not allow a reasonable jury to find that Dr. Darmody ignored a known risk to the plaintiff, disregarded his serious medical issue or failed to exercise her medical judgment when treating him. The evidence instead shows that Dr. Darmody provided thorough, reasoned care for the plaintiff's condition during the three months that she acted as his primary provider. She is entitled to judgment as a matter of law.

3.    *Defendant Russell*

The undisputed evidence would not allow a reasonable jury to find that defendant Russell was deliberately indifferent to the plaintiff's medical condition. Russell first treated the plaintiff in 2016 and provided him an AFO at that time. Years later, when the plaintiff was incarcerated at Winnebago, he specifically asked to return to see Russell because Russell had provided the plaintiff a "perfect" orthotic. Russell assessed the plaintiff's condition in January 2021 and found it to be significantly worse than before. He recommended that the plaintiff switch from an in-shoe AFO to a CROW boot, which he determined would be the best option to treat the plaintiff's deformed foot. The plaintiff agreed with this course of action. In August 2021, after the

plaintiff reported wearing the CROW boot for six weeks, Russell examined the plaintiff's foot and found a thirty-five percent improvement in ankle mobility and the condition of his foot. He noted that the plaintiff's skin was not red or irritated, which meant the boot fit properly. Russell concluded that the CROW boot was working as intended, so there was no need to adjust it or switch to a different AFO. This undisputed evidence provides no basis to conclude that Russell refused to pivot from an inefficient course of treatment, as the plaintiff alleges in his complaint.

The undisputed evidence shows that Russell exercised his professional judgment and determined that the AFO the plaintiff had in 2017 was no longer appropriate to treat his foot in 2021. He assessed the plaintiff and determined that a different kind of AFO—the CROW boot—would be most appropriate to treat his deformity. That course of action proved fruitful when after only six weeks, the plaintiff's foot improved significantly. Although the plaintiff experienced some pain while wearing the CROW boot, Russell explains that pain is common as the wearer and his body adjust to the orthotic. There is no evidence contradicting Russell's assessment or suggesting that the plaintiff's pain was unwarranted and went unaddressed. It also is undisputed that Russell did not provide medical treatment or advice, which is why he declined to weigh in on the plaintiff's request for surgery. There is no evidence suggesting that Russell had any role or involvement in the committee's decision to deny the plaintiff's request for surgery, so he cannot be held liable for that decision. No reasonable jury could find that Russell disregarded the plaintiff's

medical need or persisted in an inefficient course of treatment when he saw the plaintiff from January to August 2021.[3]

           4.    *Conclusion*

The Eighth Amendment does not entitle an incarcerated person to demand specific care or the best care possible; it entitles him to adequate, reasonable medical care "to meet a substantial risk of serious harm." <u>Forbes v Edgar</u>, 112 F.3d 262, 267 (7th Cir. 1997). Only unreasonable care that fails to meet a substantial risk of serious harm violates the Eighth Amendment. <u>See Christopher v. Liu</u>, 861 F. App'x 675, 679–80 (7th Cir. 2021).

The plaintiff did not respond to the defendants' proposed facts and did not submit any evidence in support of his claims. The defendants' undisputed evidence would not allow a reasonable jury to conclude that any defendant provided unreasonable care that failed to meet a substantial risk of serious harm to the plaintiff. The plaintiff may have wanted different treatment, such as immediate surgery, but that does not mean the treatment he received was unconstitutional or inadequate.

In his most recent communication with the court (his March 2024 request that the court appoint him counsel), the plaintiff reports that "[t]hings have gone wrong with the 2022 reconstructive surgeries;" he says there are broken screws and his foot has turned back to its pre-surgery condition, causing him a lot of pain and difficulty walking. Dkt. No. 113 at 2. He reports that since the pandemic, it has been harder to get health care appointments.

---

[3] Russell alternatively asserts that he is entitled to summary judgment because he was not acting under color of state law when he treated the plaintiff. Dkt. No. 96 at 11–13. Because the court finds that Russell was not deliberately indifferent to the plaintiff's serious medical need, it will not consider this alternative basis for summary judgment.

Id. The court's decision is not meant to minimize the pain and difficulty the plaintiff's foot has caused him. It is a determination that no reasonable jury could conclude that the defendants the plaintiff sued did not provide him with constitutionally deficient care for that pain and difficulty. The defendants are entitled to judgment as a matter of law, and the court will dismiss the case.

## III.   Conclusion

The court **GRANTS** the motion for summary judgment filed by defendants Denise Bonnett, Richard Heidorn, Michael Rivers and Sandra SItzman. Dkt. No. 82.

The court **GRANTS** the motion for summary judgment filed by Kelly Darmody. DKt. No. 90.

The court **GRANTS** the motion for summary judgment filed by defendant Bruce Russell. Dkt. No. 94.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court.* See Fed. R. App. P. 24(a)(1). The Court of Appeals may assess the plaintiff

a "strike" if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 7th day of July, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**